## Richmond.

## BOSSERMAN v. BURTON AND OTHERS.

November 15, 1923.

1. WILLS—*Vagueness and Uncertainty—Legatee or Devisee not Named—Wholly in Writing—Case at Bar.*—A testatrix in her will gave the residue of her estate "to those who shall take care of me during my last days, whoever they may be."

   *Held:* That the will was not void for vagueness or uncertainty, nor because not wholly in writing.

2. WILLS—*Designation of Beneficiary by Name—Extrinsic Evidence to Identify Beneficiary.*—It is not essential to the validity of a will that a legatee or devisee shall be designated by name in the will. It is sufficient if he be so described therein as to be readily ascertained and identified by the aid of extrinsic evidence. The extrinsic evidence in such cases does not create the legatee or devisee, but simply points out the person described in the will. It applies the will to the objects or subjects therein described or referred to.

3. WILLS—*Beneficiary—No Particular Individual in Testator's Mind.*—Nor is it essential that the testator have in mind the particular individual upon whom his bounty may fall. If he makes the particular object of his bequest ascertainable with certainty that will be sufficient.

4. WILLS—*Must be Wholly in Writing—Parol Evidence to Identify Beneficiary.*—While every part of a will must be in writing, this rule has no application to a case where every part of the will is in writing, and the only question is, can a legatee or devisee be designated by an adequate description by which he can be ascertained and identified by the aid of parol evidence. The legatee or devisee may be so designated.

5. WILLS—*Beneficiary—Beneficiary not Designated by Name—Person Answering Description of Beneficiary—Case at Bar.*—In the instant case testatrix gave the residue of her estate "to those who shall take care of me during my last days." The appellees contended that there were no persons in existence who answered this description.

   *Held:* That under the evidence appellant and his wife, at whose house testatrix died, answered the description. She having said that it was possible that she would spend the rest of her life at their house and her subsequent conduct seemed to confirm that intention.

Appeal from a decree of the Corporation Court of the city of Staunton. Decree for complainant. Defendant appeals.

*Reversed.*

The opinion states the case.

*Rudolph Bumgardner* and *J. A. Alexander*, for the appellant.

*Timberlake & Nelson*, for the appellees.

Burks, J., delivered the opinion of the court.

Rebecca H. Burton, a spinster of seventy-six years, made a will by which she gave to her natural son one dollar, and disposed of the residue of her estate as follows:

"After the payment of my debts and funeral expenses, and the above legacy of .one dollar, I devise and bequeath all the rest and residue of my estate, of every kind and nature, to those who shall take care of me during my last days, whoever they may be.

"I cannot now name them by name, as I at this time have no home and will do the best I can to find a place to spend my last days, and it is to those who shall take care of me during my last days that I want the said residue of my estate to go in fee simple."

The will bears date February 18, 1920. At that time she was staying at the home of the appellant, and was in normal health. On March 18, 1920, she went to the home of her sister in the neighborhood, to attend the funeral of her brother-in-law, and on March 21 she was taken suddenly ill and appellant was notified of the fact, and he and his wife went after her in an automobile and brought her to their home, where she died

on March 25th. A few days after her death her will was admitted to probate, and the appellant claimed the residuary legacy. On November 7, 1920, the bill in this cause was filed by the executor of Rebecca H. Burton, in which the following charges, allegations and statements are made:. "Your complainant is advised, believes and charges that the paper writing above mentioned is so vague, uncertain and indefinite that it is in law null and void and of no effect, but your complainant desires to ask the aid and advice of your honorable court in a construction of said paper as to whether said paper is in fact null and void and of no effect and should be so treated by your complainant in the administration of the estate of the said Rebecca H. Burton.

"Your complainant is further advised, believes and charges that there is no person in existence who could claim properly to come under the provisions of said paper, if it should be construed to be as valid and legal will of the said Rebecca H. Burton.

"Your complainant, however, has heard and been advised that one, L. B. Bosserman, a resident of the city of Staunton, claims that the paper above named is a good and valid will, and that he is entitled under said paper to the entire estate of the said Rebecca H. Burton.

"Under this state of facts, your complainant is advised that he is entitled to come into a court of equity and have the court construe said paper and advise him as to how he shall administer and settle the estate of the said Rebecca H. Burton, dec'd."

J. E. Burton, the illegitimate son of the testatrix, and appellant were made parties defendants, and filed their several answers in which they set forth their respective claims to the estate. Evidence was taken,

and the trial court being of opinion that the appellant "L. B. Bosserman does not answer the description of the person designated and described by the testatrix in her last will and testament as the person entitled to take her estate at her death," directed the executor, after the payment of debts and costs of administration, to "turn over the residue of said estate to John E. Burton, the only child and heir at law of the testatrix." From that decree an appeal was taken by L. B. Bosserman.

In the brief of counsel for the appellee, John E. Burton, it is said: "The two clear-cut and distinct grounds upon which our claims of invalidity is based are:

"First. That the will is so vague and uncertain that it must be declared null and void; and, further, that it does not satisfy the requirement of our statute requiring every part of a will to be in writing; and, second, that the evidence conclusively shows that it was not the purpose or intention of testatrix, either at the time the will was drawn or at any time thereafter, that appellant should become the beneficiary of her will.

"The learned court below did not pass upon the first question for the reason that the evidence demonstrated to its satisfaction that the second ground was so well taken that it was not necessary to pass on any other question."

[1, 2] The will is not void for vagueness or uncertainty, nor because not wholly in writing. It is not essential to the validity of a will that a legatee or devisee shall be designated by name in the will. It is sufficient if he be so described therein as to be readily ascertained and identified by the aid of extrinsic evidence. The extrinsic evidence in such cases does not create the legatee or devisee, but simply points out the person de-

scribed in the will.   It applies the will to the objects or
subjects therein described or referred to.   1 Redfield on
Wills (4th ed.) 274; 30 Am. & Eng. Ency. L. (2d ed.)
682; *Dennis* v. *Holsapple*, 148 Ind. 297, 47 N. E. 631, 46
L. R. A. 168, 62 Am. St. Rep. 526; and cases cited;
*Roy's Ex'rs* v. *Rowzie*, 25 Gratt. (66 Va.) 599; *Hawkins*
v. *Garland's Adm'r*, 76 Va. 149, 44 Am. Rep. 158.

[3] "Nor is it essential that the testator have in mind
the particular individual upon whom his bounty may
fall.   If he makes the particular object of his bequest
ascertainable with certainty that will be sufficient."
*Lear* v. *Manser*, 114 Me. 342, 96 Atl. 240; *Knowles* v.
*Knowles*, 132 Ga. 806, 65 S. E. 128.

In *Dennis* v. *Holsapple*, 148 Ind. 297, 47 N. E. 631, 46
L. R. A. 168, 62 Am. St. Rep. 526, 530, in speaking of a
very similar bequest to that here under consideration,
it is said: "It is true, as insisted, that it did not name
any particular person as devisee, nor was there anyone
at the time of its execution who occupied the status, or
answered to the beneficiary therein described; still, how-
ever, it so designated the person whom the testatrix
contemplated and intended should have the estate be-
queathed, that he or she, by means thereof, at her
death, could be clearly identified and ascertained by the
aid of extraneous facts.   It was at least in this respect
sufficiently certain as to fall within the principle of the
ancient maxim of the law, *id certum est quod certum
reddi potest.*"

*Lear* v. *Manser, supra,* is on all fours with the case in
judgment.   In that case the testator devised and be-
queathed all the residue of his estate "to my said execu-
tor in trust to be paid by him to such person or persons,
or such institution, as shall care for me in my last sick-
ness, such payment to be made to the person or persons,
or institution, or any or all of them as may in the dis-

cretion of my said executor be equitably entitled thereto
and the payment by my said executor and receipt taken
by him therefor shall be a sufficient voucher and dis-
charge to him under the provisions of this item.    This
provision of my will is to be considered a legacy or be-
quest and not as a performance of any contract obliga-
tion on my part."    It was held that the will created a
private trust in favor of the defendant who cared for the
testator in his last sickness, and that she was sufficiently
specified and designated by the will; that it was un-
necessary to designate the beneficiary by name or that
the testator have in mind the particular individual who
would become the beneficiary under his will.    It was
said, amongst other things, "It is not required that the
beneficiary of a private trust should be designated by
name in the instrument creating the trust.    Some other
designation will suffice if it make certain the beneficiary
intended, nor is it essential that the testator have in
mind the particular individual upon whom his bounty
may fall.    If he makes the particular object of his be-
quest ascertainable with certainty that will be suffi-
cient.    Gifts in trust for a specified class of persons, or
for a person specifically defined and described, though
not named, are not void for uncertainty in respect to
beneficiaries because such beneficiaries are capable of
identification by the terms of the instrument creating
the trust."

See also 1 Redfield on Wills (4th ed.) 275.

In 28 R. C. L. 275, the law on this subject is stated as
follows: "It is not necessary for a testator to give the
full name or description of a legatee or devisee, in order
to give effect to the bequest.    It is sufficient if the bene-
ficiary is designated with reasonable certainty; and in
such a case the beneficiary may be identified by parol
evidence of surrounding facts and circumstances.    Such

evidence is admissible to show the legatee either where the description in the will applies to several or when it does not apply to any with accuracy. Extrinsic evidence, in such case, does not create the devisee or legatee but only serves to point out the person intended as such by the testator in his will."

In *Summers* v. *Summers*, 198 Ala. 50, 73 So. 401, L. R. A. 1917C, 597, a different conclusion was reached, but the only opinion delivered was that of the minority judge, whose whole argument is adverse to the conclusion of the majority, and it is said by the annotator in L. R. A. 1917C, *supra*, that the conclusion of the majority of the court is "not in accord with other cases involving a similar situation."

*Early* v. *Arnold*, 119 Va. 500, 89 S. E. 900, is relied on by the appellees in support of the contention that the bequest in the case in judgment is too vague and uncertain to be enforced. In that case there was a devise to a son, with a remainder over, if he died without heirs, "to whoever has been his best friend." The son made a will declaring that his uncle and aunt had been his best friends. The court held that the devise of the remainder over was void for uncertainty, that who had been the best friend of the son in his lifetime was not susceptible of proof, and that even the will of the son showed an inability on his part to discriminate between his uncle and his aunt. The case is not helpful in construing the will here in controversy.

[4] *Sims* v. *Sims*, 94 Va. 584, 27 S. E. 436, 64 Am. St. Rep. 772, and *Sprinkle* v. *Hayworth*, 26 Gratt. (67 Va.) 384, are relied upon to support the proposition that every part of a will must be in writing. That proposition is not disputed, but it has no application to the case in judgment. Every part of the will is in writing, and

the only question involved in this branch of the case is, can a legatee in a will be designated by an adequate description by which he can be readily ascertained and identified by the aid of parol evidence, as well as by name. We do not doubt that he can be.

[5] Having determined that the will is not void for uncertainty, we pass to the inquiry whether there are any persons who answer the description of the residuary legatees given in the will.

The testatrix was seventy-six years of age, and had by her own labor and strict economy accumulated an estate of $1,800.00. She was in a normal condition of health and vigor for one of her years, but she had no home where she could expect the care and attention which her advancing years admonished her would soon be needed, and she had no near relatives who were in condition to provide the same for her except her natural son who lived in Kentucky. She had a maiden sister, Kate Burton, who was also advanced in years and practically without means; a brother, Wm. C. Burton, who lived at Parnassus, in Augusta county, who had a family of his own, but was not in condition to provide her a home; and a sister, Susan Alexander, the wife of J. W. Alexander, who lived in Augusta, but were both old and feeble and had contracted with a neighbor to give him their property in consideration of the fact that he would look after and care for them the residue of their lives. She also had two nephews living in West Virginia, one of whom had for some years provided a house at Parnassus for her and her sister Kate, at a nominal rent. From 1912 till the fall of 1919, she and her sister Kate had lived together and had occupied this house. In October, 1919, she determined to "shake the dust of Virginia from her feet," and go to Kentucky and make her home with her son. She accordingly packed

all of her effects in two trunks and a barrel and went to her son in Kentucky.    Her life there was anything but happy, owing chiefly to the treatment she received from the wife and children of her son, and what she regarded as their extravagant habits.    She accordingly returned to Virginia in the latter part of January or the first of February, 1920, with the fixed purpose of spending her "last days" amid her old surroundings.    It is clear that she never intended to return to Kentucky.    It is equally clear that she intended to "change her will" and disinherit her son.    Under the circumstances, she felt the necessity of providing, from her own means, the care and attention usually incident to old age and declining health.    Whether the period of her "last days" would be few or many she could not foretell, but she declared in her will "it is to those who shall take care of me in my last days that I want the residue of my estate to go in fee simple."

For a number of years prior to 1912 the testatrix and her sister Kate had made their home with their brother-in-law, William Y. Fauver, in the city of Staunton, and upon his death in 1912, they moved to the house at Parnassus hereinbefore mentioned.    While in Staunton they lived next door to Mrs. Tribbett, and a very close intimacy subsisted between the two families.    The testatrix became very much attached to Miss Blanche Tribbett, a daughter of the family, who afterwards married the appellant, L. B. Bosserman, in 1914.    This attachment continued during the life of the testatrix, and, after removal to Parnassus, the testatrix made the Bosserman home her headquarters whenever she came to Staunton, and when she started on her trip to Kentucky she left from the Bosserman home.    The attachment was mutual and she was always cordially received as a welcome visitor.    She called Mr. Bosserman Luther

and his wife Blanche, and they called her "Aunt Beck" or "Mammy Beck." On her return from Kentucky she stopped by for a visit of about two weeks to her sister, Mrs. Alexander, and went thence to the house of the appellant, without previous notice of any kind. She arrived during the supper hour and was invited to take supper and spend the night, which invitation she accepted. There had been no correspondence between the testatrix and the Bossermans during her absence, and they did not know of her return to Virginia until she walked in their house. While there she related her troubles in Kentucky and her inability to live there, and stated that she was out of a home and did not know where to go, and Bosserman testified: "I told her then, Miss Beck, just make your home right here, and she had her baggage moved to my house and it is there now." She was a woman "who had a great deal of trouble," and the Bossermans sympathized with her. It is said of her in appellee's brief that she was "nervous and worried," and that she was "old and dissatisfied everywhere." She was unable to live with her son, and was unwilling to live with her sister Kate because "she was too old to be nagged, and she couldn't stand the treatment her sister gave her," while the Bossermans always received her with hospitality, and "had been kinder to her than any of her own people; had done a great deal more for her." Such was the situation, when the testatrix applied to the appellant to draw a will for her. This he declined to do for want of adequate knowledge of such matters and suggested that she apply to some lawyer. She then applied to Mr. Kennedy, a lawyer of standing in Staunton and an old acquaintance, who prepared the will in controversy substantially at her dictation, and it was duly signed and attested. She seemed to be greatly relieved and pleased at the execution of

her will, and later told Mrs. Bosserman and others of the provisions she had made for care and attention in her "last days," though Bosserman himself says he had no knowledge of the nature of her will prior to its probate.    The will shows on its face that, at the time of its execution, the testatrix had not finally determined on the place at which she would spend her last days.    The difficulties she had encountered in living with her own kindred seem to have caused her to mistrust herself, but she said to Kennedy, the scrivener of her will, that "she was not absolutely sure yet with whom she would make her home, that she probably would spend the rest of her life in the home of Mr. L. B. Bosserman, but as to that she was not absolutely sure, and she preferred that the name of the person with whom she would make her home should have her estate for that reason be not included in the will." The record does not show that this tentative purpose was ever changed, or any other arrangement made.    There is some testimony as to some proposals made by Mrs. Bettie Miller and to Mr. Ellis, but they were never carried out, and neither of them does or could lay any claim to the legacy.    It is claimed, however, by the appellees that these proposals show an abandonment of any purpose the testatrix may have had of remaining in the Bosserman home, and as there was no other person who answered the description given in the will of the residuary legatee, the testatrix died intestate.    But the proposals themselves, if ever made when the testatrix was mentally capable, were never acted on, or were withdrawn, and the testimony is far from satisfactory that there was any such abandonment.    The will is dated February 18, 1920, two days after the testatrix arrived at Bosserman's.    She remained there for a week or ten days and then she went to Parnassus for a few days on business with her

agent, but was detained there ten days or two weeks by the illness of her sister Kate. She then returned to the Bossermans' and remained there until March 18, when she was notified of the death of her brother-in-law, Mr. Alexander, at Lyndhurst, in Augusta county. Her brother, William, who lived at Parnassus, came by for her and carried her to Lyndhurst to attend the funeral. She remained there until March 21, when she was taken suddenly ill. Her brother, William, was 'phoned to at Parnassus by a neighbor to come and look after her, but being unable to do so, he requested that Bosserman be notified and requested to go and get her and bring her to Staunton. Thereupon Bosserman and his wife took an automobile and went to Lyndhurst and got her and brought her to their home in Staunton. Her condition was found to be serious, and a doctor was sent for at once and a trained nurse obtained, and these, together with Mrs. Bosserman, gave her every attention possible, but she lapsed into unconsciousness early the next morning and so continued until her death on March 25th. She was buried from the Bosserman home. Her son was promptly notified of her serious illness and subsequently of her death, but did not attend. When Bosserman and his wife went to Lyndhurst for her on March 21st to bring her to their home, they found her anxious to return. The scene is thus described by Mrs. Bosserman:

"Well, we got the machine and went up after her— went up to see about her, and as soon as she saw me she said, 'Oh, Blanche, I am so glad you have come,' and caught hold of my hand and wouldn't let loose of me while we were getting her ready. She said 'please take me with you,' and kept begging me to take her. She wouldn't let me loose long enough to put her wraps on because she was afraid I was not going to bring her

home with me.   She said she wanted to come back with me to my house."

When. asked how they came back, Mrs. Bosserman says: "Well, we were in the back seat and I fixed her as comfortable as I could, kind of propped her up, and held her as good as I could in the machine and she stood the trip fine and talked all the way home, and every now and then she would say, 'I am so glad you all came for me; I am glad to get away from that place.' "

Mr. Bosserman's statement on the subject was: "On Monday evening, March court, 1920, I took my machine and my wife and we went down there and found the old lady in pretty bad shape.   She was conscious and knew everything that was going on, and I says, 'Miss Beck, do you want to go home with me, or what do you want to do?' She says, 'For God's sake, Luther, take me away from this place.' I gathered her up in my arms and carried her out and put her in the machine, and brought her home and called Dr. Parkins and got a nurse.   She lapsed into unconsciousness that night and was never conscious any more "

The evidence is replete with evidence that the testatrix had determined that her son's family should not have any portion of her estate, and that she would never again attempt to live with any of her relations.   It is also. clear that Bosserman and his wife had been very kind to her and had offered her a home with them.   The probability that she "would spend the rest of her life in the home of Mr. L. B. Bosserman," spoken of by her at the time her will was drawn, seems to have been confirmed by her subsequent conduct, and is not removed by the testimony as to the proposal made by Mrs. Miller or that declined by Mr. Ellis.   There is serious conflict in the testimony as to the Miller proposal, and it is doubtful if the testatrix's mental condition at the

time of the proposal to Mr. Ellis was such that it could be seriously considered.   Ellis himself, when asked as to her mental condition the night the proposal was made to him to take care of her, states: "I can't say about that.   She was wild.   Seemed to be excited all the time she talked."   The record fails to disclose a fixed purpose on the part of the testatrix to abandon her expectation, expressed when her will was written.   When the will was written she was at the home of Bosserman and so far regarded that as her home that she thought it probable she would remain there the rest of her life.   If there was ever any wavering in that purpose, it never went to the extent of an abandonment.   She clung to the Bosserman's in her last conscious hours, and they gave her the faithful and tender ministrations which she sought by her will to provide.   We are of opinion that Luther R. Bosserman and Blanche, his wife, answer the description of the residuary legatees given in the will of the testatrix, Rebecca H. Burton, and that the Corporation Court of the city of Staunton erred in holding otherwise.   The decree of said corporation court will therefore be reversed, and a decree will be entered in this court directing the appellee, Randolph C. Keller, executor of Rebecca H. Burton, after the payment of the debts of the said Rebecca H. Burton, and the costs of administering her estate, to pay the residue of said estate to Luther B. Bosserman and Blanche, his wife, in equal shares.

*Reversed.*